UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MARK LOPEZ,

                              Plaintiff,

v.                                                          Case No.  5:04-cv-324-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                              Defendant.

_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner) denying his application for social security disability insurance benefits and Supplemental Security Income. The Commissioner has answered (Doc. 10), and both parties have filed briefs outlining their respective positions. (Docs. 19 & 20.) For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **AFFIRMED.**

## I. PROCEDURAL HISTORY

Plaintiff filed an initial application on April 30, 1998, alleging an onset date of December 31, 1997. (R. 72, 133.) His claim was denied initially and upon reconsideration. (R. 73, 75, 100, 107. ) Plaintiff requested a hearing before an Administrative Law Judge (the "ALJ") which was held on April 9, 1999. (R. 40, 79.) By decision dated May 24, 1999, ALJ Irwin Bernstein found Plaintiff was not disabled. (R. 79-89.)  Plaintiff reapplied for benefits in August of 1999 after the unfavorable decision. (R. 169-72.) In December of 1999, a consulting state agency physician found Plaintiff

met the listing requirements for a favorable disability decision based on his mental impairments (R. 346) and Plaintiff was awarded benefits retroactive from May 1, 1999.

Plaintiff also requested that the Appeals Council review ALJ Bernstein's unfavorable decision. (R. 34, 114.) The Appeals Council accepted review and remanded the case for further hearing on June 14, 2002. (R. 115-122.) A supplemental hearing was held on February 13, 2003. (R. 45-71.) By a decision dated March 26, 2003, ALJ Franklin D. Holder found that Plaintiff met Listing 12.04A and B, but the Plaintiff had not provided enough evidence to prove he was disabled prior to May 1, 1999. (R. 23.) Plaintiff's request for review of that decision was denied by the Appeals Council on May 19, 2004, rendering this decision of ALJ Holder the final decision of the Commissioner. (R. 12.)

## II.  <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which

---

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

3

significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[16]

---

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows: In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

### A.  Personal and Occupational Background

Plaintiff, born on August 6, 1970, (R. 48) was thirty-two years old at the time of the hearing. He had completed school through the ninth or tenth grade and had attended special education classes. (R. 49, 152, 180.) Plaintiff received no other

---

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.")

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

vocational training and worked primarily as a laborer and airport cargo handler. (R. 49, 162, 175, 186.) His work as a laborer entailed working on demolition jobs lifting sheet rock, boards, and mixing cement. (R. 50.) He noted that his job as a laborer and airport cargo handler required him to spend eight hours walking and standing, one hour climbing, and four hours in a stooped, kneeling, or crouched position and often required him to bend down to accomplish tasks. The heaviest objects he lifted weighed 100 pounds or more (R. 175, 187) and he frequently lifted objects of over fifty pounds. (R. 187.) His job included operating a forklift.

Plaintiff claimed disability due to affective and personality disorders, neck and back pain from arthritis and a herniated disc, and uncontrollable twitching. (R. 51-52, 72, 74, 145, 158, 174, 183.) Plaintiff testified that he had trouble walking, standing, bending, and sitting to some degree, though he alternated sitting and standing or walking as needed.  (R. 55, 145, 153,156, 162, 165, 183.)  Plaintiff also claimed he was told not to lift anything. (R. 158.) Plaintiff was prescribed various medications to control his pain and depression, though nothing gave him complete relief. (R. 53-54, 163, 184, 195, 279.)

Because the issues presented in this case concern the extent of Plaintiff's mental impairments and how the ALJ determined May 1, 1999 as the onset date of Plaintiff's disability, the summary of the record evidence below will primarily discuss Plaintiff's mental impairments. Plaintiff does not challenge the ALJ's determination of Plaintiff's Residual Functional Capacity ("RFC") which included the finding that Plaintiff could

perform unskilled, sedentary work. As a result, Plaintiff's physical impairments will not be discussed in the body of this opinion.[21]

B. **Plaintiff's Mental Impairments**

There is significant evidence in the record with respect to Plaintiff's dyslexia and depression. Plaintiff's mental health appeared to remain relatively stable, but began to deteriorate sharply in the middle of 1999. With respect to Plaintiff's dyslexia, he claimed that this impairment interfered with his reading comprehension and caused him to become easily confused. (R. 58, 162, 164, 191-92, 194.)

Most of the evidence in the record dealt with Plaintiff's depression and personality disorders. With respect to his depression, Plaintiff testified that he is depressed and suffers from bipolar disorder. (R. 54, 59, 64, 148, 165.) Plaintiff claimed that due to his mental impairments and personality disorders, he frequently argued with his supervisors or coworkers and had trouble socializing with others. As a result, he has never held a job for more than six months. (R. 61-62, 143, 158, 192, 201, 235.) However, in September of 1999, Plaintiff told the Office of Disability Determinations that he did not have problems with people in authority and the public. (R. 192.)

The first record of Plaintiff's mental health was an evaluation by the Osceola Evaluation and Treatment Center from July of 1995. Plaintiff's appearance, behavior,

---

[21] Throughout the record, Plaintiff was treated for back pain and neck pain which he attributes to injuries from a car accident in 1990 (R. 199-200, 204-206, 223, 225, 228,  238-39, 241, 244,  282-86, 292-93, 298, 345, 356, 367, 403-410 ) and a nervous tic (R. 171, 230, 289-90, 330) which Plaintiff claimed relieved the pain in his neck but was suspected to have a psychological component. His conditions were treated conservatively with medication and physical therapy, although Plaintiff was referred for pain management. (R. 230, 289-90, 293.) However, Plaintiff did not follow-up with this referral. Plaintiff had a diskectomy in 1999 and the prognosis was for a good recovery. (R. 298, 392, 332.) Plaintiff was assessed by most of his treating and consultative physicians and the agency doctors as having the capacity to perform light duty work. (R. 206, 230, 246, 334-38.) Plaintiff was also treated for gout and asthma. (R. 195, 359, 361-64, 367 374-5.)

speech, affect and mood, and judgment, were all within normal limits. He was oriented times three, but had poor insight and fleeting suicidal ideation, though no plan or intent to actually hurt himself. He was referred to outpatient services. (R. 269-70.)

In July of 1998, Plaintiff was referred by the Office of Disability Determinations to Dr. F. Howard Buss, a licensed psychologist, for a consultative examination. He diagnosed Plaintiff with a Dysthmic Disorder,[22] Amnestic Disorder, Provisional,[23] and Passive-Aggressive Personality[24] traits. Dr. Buss found Plaintiff to be alert and oriented times three. He noted that Plaintiff had no delusions or hallucinations and that Plaintiff's insight and judgment were fair. Dr. Buss concluded that Plaintiff's mental health was fair and that Plaintiff could competently manage his own financial affairs. (R. 202.) Dr. Buss found that Plaintiff's inability to work was a result of Plaintiff's own self-fulfilling prophecy, rather than any significant impairment. He recommended Plaintiff receive vocational rehabilitation and that Plaintiff could maintain employment with the help of a job coach. (R. 203.)

Dr. Buss noted that Plaintiff was moody and anxious. There was some evidence of suicidal ideation without intent to act, and Dr. Buss noted that Plaintiff's "attention and concentration were minimally impaired" as was his immediate and recent memory,

---

[22] A dysthmic disorder is characterized by a "chronically depressed mood that occurs for most of the day more days than not for at least 2 years." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 376 (4th ed. 200) [hereinafter: DSM-IV].

[23] An amnestic disorder is characterized by a disturbance in memory which impairs an individual's ability to learn new information or to recall previously learned information or past events. DSM-IV at 172.

[24] Passive-aggressive personality is characterized by an individual's resentment, opposition, and resistance to demands to function at a level expected by others in either social or occupational settings. Such individuals blame their failures on others and tend to complain about feeling unappreciated and misunderstood. DSM-IV at 790.

though long-term memory appeared to be intact. The memory deficits were compounded by other psychological factors.[25] (R. 202.)

In a Mental Residual Functional Capacity Assessment ("MRFCA") performed by the agency in July of 1998, it was noted that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions as well as in his ability to maintain attention and concentration for extended periods. The agency found that Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. (R. 207-08.)

However, Plaintiff was found not to be significantly limited in his ability to remember locations and work procedures or to remember, understand, and carry out short and simple instructions. No significant limitations were found on his ability to perform activities within a regular work schedule, to work with others without being distracted by them, or to make simple work decisions. (R. 207.) In addition, no significant limitations were found on Plaintiff's ability to engage in appropriate social interaction with the public, supervisors, or coworkers, nor in his ability to adapt to a work environment and responsibilities.

 The agency based this assessment on evidence in the record which described Plaintiff as having worked successfully in the past but suffering from mild depression. It was noted that Plaintiff had adequate social interaction, intact cognitive abilities, an IQ in the low average rage and no evidence of psychosis. It was also noted that Plaintiff

---

[25] It was noted throughout the record that Plaintiff had trouble with concentration, attention, and his memory. (R. 66-67, 142, 158, 192-94.)

had the potential to function normally with respect to his activities of daily living, and was not as "helpless or handicapped" as he claimed. (R. 209-10.)

In the Psychiatric Review Technique ("PRT") completed for the agency in July of 1998, it was noted that Plaintiff suffered from Affective or Dysthmic Disorder and various Personality Disorders. (R. 211, 214, 216.) However, the PRT revealed that Plaintiff only had slight restrictions on his activities of daily living and ability to function socially, despite often exhibiting signs of deficiencies in concentration, persistence, or pace. (R. 218.)

On September 1, 1998, Plaintiff appeared at the 45th Street Mental Health Center for an initial assessment and was evaluated on September 2 by Dr. M. Sultana. (R. 324-25.) Dr. Sultana noted that Plaintiff was cooperative, talkative, and had a coherent thought process with affect appropriate to his thoughts. (R. 232-33.) Plaintiff was not suicidal and was oriented to person, place, and time. Dr. Sultana found that Plaintiff was depressed with paranoid ideations and insomnia. He had fair insight and judgment, fair recent and remote memory, but had impaired concentration and low average intelligence. (R. 233.) Dr. Sultana diagnosed Plaintiff with Depressive Disorder, Histrionic Personality Disorder and a Global Assessment Functioning ("GAF") score of 60.[26] Plaintiff declined to attend individual therapy sessions. (R. 234.)

In November of 1998, Dr. David M. Bortnick, a clinical and neuro-psychologist, examined Plaintiff at the request of the Office of Disability Determinations. (R. 253.) Dr. Bortnick noted that while Plaintiff had returned to the 45th Street Mental Health Center

---

[26] A GAF score of 60 signifies that the individual has "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning."

three or four times, he had not received any treatment nor was taking any psychotropic medication at the time of the evaluation. (R. 253.) Dr. Bortnick noted that Plaintiff was alert and oriented and that his affect, behavior, dress, and speech were appropriate. Dr. Bortnick did not observe any behavioral signs of anxiety, depression, or pain. He noted that Plaintiff's recent and remote memory were intact, that Plaintiff could concentrate, and did not appear to suffer any hallucinations, delusions, psychotic processes or cognitive impairment. Dr. Bortnick found Plaintiff to have normal and age appropriate interests and adaptative skills and that Plaintiff had "the mental ability to work in some capacity if he is motivated to do so." (R. 254.) Dr. Bortnick suggested that Plaintiff might benefit from vocational rehabilitation, but could perform work activities without psychological restriction and was capable of managing his own finances. (R. 255.) However, Dr. Bortnick revealed that throughout the evaluation, Plaintiff was superficially friendly while seeming angry and frustrated, and he diagnosed Plaintiff with Adjustment Disorder with Depressed Mood, in partial remission.

In November of 1998, an agency psychologist, Susan Shapiro completed another PRT. She noted that Plaintiff had an Affective Disorder which included symptoms of depression and a Personality Disorder with signs of inappropriate hostility, mood disturbance, and passivity or aggressivity. (R. 256, 259, 261.) She noted that Plaintiff had only slight restrictions on his activities of daily living, slight to moderate difficulties in maintaining social functioning, and often had deficiencies of concentration, persistence or pace. (R. 263.)

In a new  MRFCA, Dr. Shapiro made similar findings to the initial assessment discussed above with respect to the fact that Plaintiff was not significantly limited in his

ability to understand, remember, and carry out simple or complex instructions, maintain

a regular work schedule and routine, and make simple work-related decisions. She also

found Plaintiff's ability to work with the public, coworkers, or maintain generally socially

appropriate behavior was not significantly impaired, nor was his ability to adapt to a

work environment. She did note that Plaintiff was moderately limited in his ability to

concentrate for extended periods and in his ability to work with others without being

distracted by them. (R. 265.) Dr. Shapiro also remarked that Plaintiff was moderately

limited in his ability to complete a normal workday or workweek without interruption from

psychologically based symptoms. Plaintiff was also found to be moderately limited in his

ability to accept instructions and respond appropriately to criticism from advisors. (R.

266.)

On March 15, 1999, Helen Steele, ARNP, examined Plaintiff at the 45th Street

Mental Health Center upon the insistence of Plaintiff's attorney. ARNP Steele found

Plaintiff was depressed without suicidal ideation, irritable and defensive, but seemed

open to receiving help. He claimed he was not hearing voices at the time, but he had

heard them in the past. (R. 295.) She prescribed Paxil to treat Plaintiff's depression and

anxiety and Respiradol to control Plaintiff's paranoia and negative thoughts. She

diagnosed him with a depressive disorder with paranoid features, histrionic personality,

and a GAF of 60. (R. 295.)

On March 22, Plaintiff stated that he felt calmer and his sleep had improved,

though he continued to feel depressed. Steele noted that Plaintiff appeared depressed

but less irritable with an absence of psychosis. Plaintiff advised Steele that his goal was

to move out of his parents' home but he felt that due to his dyslexia, he could not find a

job, nor did he want to work. Plaintiff maintained a GAF of 60 (R. 294), and in April, Plaintiff's GAF was elevated to 65.[27] Steele also recommended Plaintiff attend therapy sessions. (R. 323.)

On April 28, 1999, ARNP Steele completed a Medical Assessment of Ability to Do Work-Related Activities for Plaintiff. She remarked that his ability to follow work rules was good, as was his ability to understand, remember, and carry out complex, detailed, and simple instructions. He also had the ability to maintain his personal appearance. She found that Plaintiff's judgment, ability to interact with a supervisor, ability to function independently, ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability were fair. (R. 326-28.) Steele noted Plaintiff's ability to maintain attention/concentration was only fair because Plaintiff became easily frustrated due to anxiety. However, she found Plaintiff's ability to relate to co-workers, handle the public, or work stress was poor. (R. 326.) Yet, she opined that he was capable of managing benefits in his own best interest. (R. 328.)

In May of 1999, Nancy Newbury, ARNP, evaluated Plaintiff who claimed he was not having any side effects from his medication and that he was sleeping better. He still had thoughts that other people were talking about him. Plaintiff said that he would be interested in one-on-one counseling, but not group therapy. Newbury diagnosed Plaintiff with a GAF of 60, commenting that Plaintiff was "quite invested in his injury," and recommending therapy to help him deal with his anger and trust issues. (R. 322.)

---

[27] A GAF of 65 signifies that the individual has "some mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV 34.

In October of 1999, the Office of Disability Determinations referred Plaintiff for another psychiatric consultative examination with Steven Edney, a clinical psychologist and Daphne Tucker, a licensed clinical social worker. The examiners noted that Plaintiff was having trouble refilling prescriptions for his anti-depressants and other medication due to financial difficulties. He had "extreme difficulty" with short and long-term memory. (R. 342.) His thoughts were disorganized and he had difficulty paying attention. Plaintiff also had difficulty reciting the alphabet, spelling two five-letter words forward and backward, and counting to forty by three's. The examiners concluded that Plaintiff suffered from depression and "would be unable to fulfill the requirements of most employment opportunities due to his depression and reported physical pain and limitations." (R. 343.) They stated that "this claimant does not appear to be capable of handling his financial affairs." (R. 344.)

An agency psychologist found in December of 1999 that Plaintiff met Listing 12.04A and B for disability due to an Affective Disorder. (R. 346.) Plaintiff was found to have all of the symptoms of a depressive and bipolar syndrome (R. 349) and marked restrictions on his activities of daily living, ability to maintain social functioning, and frequent deficiencies of concentration. (R. 353.)

In July of 2001, Plaintiff was found to have Bipolar Disorder, and upon admittance to the Life Stream Behavior Center, was diagnosed with Major Depressive Disorder, exhibiting suicidal thoughts, an inability to concentrate, and a GAF of 30.[28] He

---

[28] A GAF of 30 reflects that the individual's "behavior is considerably influenced by delusions or hallucination OR serious impairment in communication or judgment . . .OR inability to function in almost all areas." DSM-IV at 34.

claimed he stopped taking his medication due to side effects. (R. 384-889.) He was prescribed various psychotropic medications including Wellbutrin, Depakote, Prozac, Zyprexa, and Fluoxetine while under the care of doctors at Life Stream. (R. 377-78, 384.) Plaintiff showed some improvement thereafter (R. 391- 398), but in 2002, Dr. Salazar, who was treating Plaintiff at Life Stream, found that Plaintiff was "unable to function to any level in a work related situation." (R. 402.) A similar finding was made in 2002 by a psychologist and mental health counselor at Hope Counseling Centers and in an additional agency assessment. (R. 411-414, 415.) Plaintiff was hospitalized for a possible suicide attempt in November of 2002[29] (R. 418) and found to have a GAF of 35.[30] (R. 420.)

## C. Plaintiff's Daily Activities

While Plaintiff claimed his date of onset was December 31, 1997, Dr. Paul Weisman noted that in August of 1998 Plaintiff stated he was still part of a Labor Pool. (R. 225.) Plaintiff was living with his parents from 1998 until sometime after he began receiving his disability checks in 1999 or 2000. At that time, he moved into his own apartment. When Plaintiff was living with his parents, he noted and testified that his mother did most of the cooking and household chores. (R. 141-42, 255.) However, Plaintiff said he occasionally volunteered to vacuum, and could cook and go shopping. He testified that he cleans his apartment, but his pain and depression affect his ability to sleep and complete these household tasks. (R. 146, 148, 255, 62-63, 184.)

---

[29] A previous suicide attempt was noted in 2001. (R. 419.)

[30] A GAF of 35 signifies that the individual has "some impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 34.

Plaintiff claimed that he does not visit other people, nor does he have any friends or participate in any social activities. (R. 192-94, 203, 255.) He gets along somewhat with his family. (R. 141, 192, 201, 255.) He stated that he sometimes played ball and washed dishes. (R. 67, 151, 165, 255.) He drives when necessary or to go to the beach. (R. 255.) Plaintiff testified that he spends most of the day lying down watching movies and television or listening to music and then will get up to take a walk. (R. 163, 65, 166,193, 255.) Plaintiff told Dr. Buss that he occasionally exercised at the gym,[31] but did not talk to anyone while he was there. (R. 202.) His mother told the agency that he cannot bend down to get food out of the refrigerator and she has to tie his shoes. Plaintiff also has to sit when he showers and needed some help in bathing. (R. 141, 165, 184, 192, 194.)

## IV. **DISCUSSION**

The Plaintiff raises two issues on appeal. First, the Plaintiff contends that the ALJ erred in applying the Grids to determine if there was work Plaintiff could perform in the national economy when the use of the Grids was precluded by Plaintiff's non-exertional mental impairment. The Plaintiff asserts that the ALJ erred as a matter of law by not obtaining vocational expert testimony to determine whether such work existed. Second, the Plaintiff contends that the ALJ should have elicited testimony of a medical expert to determine the date that Plaintiff was disabled.

---

[31] In December of 1998, Dr. Montijo wrote Plaintiff a letter to give to the gym claiming that Plaintiff was unable to use his gym membership due to lumbar and cervical spine problems.  (R. 239, 291.)

## A.  **Use of the Grids**

The ALJ determined that Plaintiff had the RFC to perform unskilled, sedentary work prior to May 1, 1999. He also found that Plaintiff had moderate limitations in social functioning and moderate deficiencies in concentration, persistence or pace prior to May 1, 1999. Based on his RFC finding, the ALJ determined that Plaintiff could not perform his past relevant work. Thus, the burden of proof shifted to the Commissioner to establish that the claimant could perform other work that exists in the national economy.[32] The burden of showing by substantial evidence that a person who can no longer perform his former job can engage in other substantial gainful activity is satisfied by either the use of vocational expert testimony,[33] or, when the claimant can perform unlimited types of work at a given residual functional level, by use of the Grids.

In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.[34] This burden may sometimes be met through exclusive reliance on the Grids when each variable on the appropriate grid accurately describes the claimant's situation.[35]  Exclusive reliance on the Grids is not appropriate either when the claimant is unable to perform a full range of work at a given functional level or when a claimant has non-exertional impairments that significantly limit basic work skills.

---

[32] *See* <u>Foote v. Chater</u>, 67 F.3d 1553, 1559 (11th Cir. 1995).

[33] *See id.*

[34] *See* <u>Allen v. Sullivan</u>, 880 F.2d 1200, 1201 (11th Cir. 1989).

[35] *See* <u>Walker v. Bowen</u>, 826 F.2d 996, 1003 (11th Cir. 1987).

Here, the ALJ relied exclusively on the Grids because the ALJ concluded that Plaintiff had the exertional capacity to perform substantially all of the requirements of unskilled sedentary work and that Plaintiff's non-exertional mental impairments did not significantly limit his basic work skills. Pursuant to Social Security Ruling 85-15,

> where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

There is substantial evidence in the record to support the ALJ's conclusion that Plaintiff's nonexertional impairments did not significantly limit his basic work skills as defined in the above Ruling on unskilled work.

Significantly, none of the medical personnel who examined and treated Plaintiff prior to May 1, 1999 opined that Plaintiff could not work due to his mental impairments. In 1998, Dr. Buss, a consultative examiner, found that Plaintiff's concentration, attention, and recent memory were minimally impaired but his long term memory was most likely intact and his insight and judgment were fair. Dr. Buss concluded that Plaintiff's mental health was fair and that he could manage his own finances. Notably, Dr. Buss commented that Plaintiff's inability to work was a self-fulfilling prophecy and that Plaintiff could maintain employment with help from vocational rehabilitation services and a job coach. Dr. Sultana at the 45th Street Mental Health Center found Plaintiff to be functioning with a GAF of 60, and also noted that he had fair insight, judgment, and

18

memory, but some impairment as to his level of concentration. In November of 1998, Dr. Bortnick made similar findings to the other doctors and found Plaintiff's employment difficulties stemmed more from a lack of motivation than any psychological impairment. He noted that Plaintiff had "the mental ability to work in some capacity if he is motivated to do so."

In March of 1999, ARNP Steele prescribed medication to help Plaintiff's anxiety and depression which made Plaintiff feel calmer and improved his sleep. Between March and mid-April, Plaintiff had a GAF of between 60 to 65 and showed improvement in his depression. On April 28, 1999, ARNP Steele completed a Medical Assessment of Ability to do Work-Related Activities for Plaintiff and noted that his ability to follow work rules, remember, understand, and carry out simple or complex instructions was good, his judgment, ability to interact with supervisors, function independently, and concentrate were fair. She found that he might have difficulties relating to coworkers, the public, or dealing with stress, but she also noted he had a fair ability to behave in an emotionally stable manner, demonstrate reliability, and relate predictably in social situations. She also found that Plaintiff could manage his own finances. In May of 1999, Nancy Newbury noted that Plaintiff claimed he was feeling and sleeping better. He appeared "quite invested in his injury" and individual therapy sessions were discussed to help Plaintiff deal with his anger and trust issues.

While the ALJ is not bound by state agency findings, nor bound to incorporate the B criteria of the PRT's into Plaintiff's RFC assessment,[36] the ALJ considered these reports and noted that while the Plaintiff "had non-exertional limitations with moderate limitations in social functioning and deficiencies in concentration . . . the clinical findings resulting from these impairments do not appear to be of a degree capable of producing limitations of incapacitating proportions." (R. 30.)The MRFCA's completed by the agency physicians noted that Plaintiff had no significant limitations on his ability to remember, understand, and carry out very short and simple instructions, his ability to perform activities within a schedule, maintain regular attendance, and be punctual, his ability to sustain an ordinary routine without special supervision, and to make simple work-related decisions. Moderate limitations were found on Plaintiff's ability to understand, remember, and carry out detailed instructions, work in coordination or proximity to others without being distracted by them, and to maintain concentration and attention for extended periods. Some limitation was noted in Plaintiff's ability to complete a normal workday or workweek at a consistent pace, and in Plaintiff's ability to interact appropriately with supervisors. No significant limitations were noted on his general social interaction abilities or his ability to adapt to situations in a work setting.

With respect to the PRT, both agency psychologists noted that Plaintiff had only slight restrictions on his activities of daily living. One found that Plaintiff had slight, and the other slight to moderate, difficulties in maintaining social functioning. Both found Plaintiff often had deficiencies in concentration, persistence, and pace.

---

[36] *See* 20 C.F.R. § 419.927(f)(2)(i); *see also* Iris M. Martino v. Jo Anne B. Barnhart, No. 00-00186-CV-10 (11th Cir. Sept. 27, 2002) (unpublished).

In light of such substantial evidence, there was nothing in the record to demonstrate that Plaintiff suffered a substantial loss of ability to meet any of the basic work-related activities discussed in Social Security Ruling 85-15. Reports submitted around May 1, 1999, and thereafter, present evidence that Plaintiff's mental state was such that he could not carry out such basic functions as remembering simple instructions or interacting with coworkers. But prior to this date, substantial evidence in the record demonstrates that Plaintiff was capable of carrying out simple instructions, adapting to a work environment, and maintaining employment if he was motivated to do so.

The ALJ specifically took Plaintiff's mental impairment into consideration by finding that Plaintiff should be limited to performing unskilled sedentary work because such work required little or no judgment to perform simple duties that could be learned quickly on the job. The medical opinions above reveal that Plaintiff possessed only fair judgment, but that he was capable of understanding, remembering, and completing simple, and sometimes more complex, tasks. In light of this, the ALJ did not err in applying the Grids because there was substantial evidence in the record to show that Plaintiff's mental impairments did not erode the work base for unskilled sedentary work.

## B. Onset Date

The Plaintiff contends that the ALJ erred by not calling a medical expert to determine Plaintiff's disability onset date. Plaintiff cites Social Security Ruling ("SSR") 83-20 in support of this proposition. The Court finds that the ALJ was not required to obtain the advice of a medical expert because the ALJ's conclusion that Plaintiff's

condition did not become disabling until after May 1, 1999 is supported by substantial medical evidence in the record.

SSR 83-20 states the policy and describes the relevant evidence to be considered when establishing the onset date of disability. "Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence."[37] "However, the individual's allegation, or the date of work stoppage, is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence."[38]

In the case of slowly progressive impairments "it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process."[39] In such a case, the ruling cautions that "the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred."[40]

Although the Eleventh Circuit has not considered the issue of when an ALJ is required to obtain the advice of a medical expert, several other Circuits have interpreted

---

[37] SSR 83-20.

[38] *Id.*

[39] *Id.*

[40] *Id.* When inferring an onset date before the first medical examination, the services of a medical advisor are necessary to provide a legitimate medical basis for the judgment. *Id.* In the instant case, the ALJ inferred the date of disability after several medical personnel had performed mental and physical examinations of Plaintiff. These examinations occurred well after the alleged onset date and in proximity to the date the ALJ determined Plaintiff's period of disability began.

the medical expert provision of SSR 83-20.[41] The Seventh and Sixth Circuits have

applied a restrictive interpretation of SSR 83-20. In *Scheck*, a Seventh Circuit case, and

in *Key*, a Sixth Circuit case, the view was adopted that SSR 83-20 has no application to

cases in which the ALJ does not find the claimant to be disabled because in the

absence of a finding of disability there is no reason to determine the date of onset.[42]

Other courts of appeal, however, have taken a less restrictive view of the text of

SSR 83-20. The Eighth and the Third Circuits have both held - in cases where the

claimant's impairment is slowly progressive and the ALJ is required to make a

retroactive inference of disability prior to the date last insured - that the ALJ is required

to call upon the services of a medical advisor, if the medical evidence during that time

period is ambiguous or inadequate.[43]

Because the issue of onset is inextricably tied to the determination of disability in

cases where the impairment is a slowly progressive condition that is not traumatic in

---

[41] *See, e.g.,* Walton v. Halter, 243 F.3d 703, 709 (3d Cir. 2001); Bailey v. Chater, 68 F.3d 75, 79 (4th Cir. 1995); Spellman v. Shalala, 1 F.3d 357, 363 (5th Cir. 1993); Key v. Callahan, 109 F.3d 270, 274 (6th Cir. 1997); Scheck v. Barnhart, 357 F.3d 697, 701 (7th Cir. 2004); Henderson ex rel Henderson v. Apfel, 179 F.3d 507, 513 (7th Cir. 1999); Grebenick v. Chater, 121 F.3d 1193, 1201 (8th Cir. 1997); Armstrong v. Commissioner, 160 F.3d 587, 590 (9th Cir. 1998); Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995).

[42] Scheck, 357 F.3d at 701 ("The ALJ did not find that Scheck was disabled, and therefore, there was no need to find an onset date.  In short, SSR 83-20 does not apply."); Key, 109 F.3d at 274 ("The Commissioner responds to this argument by asserting that SSR 83-20 is not applicable to this case, since this policy statement applies only when there has been a finding of disability and it is necessary to determine when the disability began.  We agree.").

[43] Walton, 243 F.3d at 709 (medical advisor required where "[a]dequate medical records for the most relevant period were not available;" the "impairment was a slowly progressive one and the alleged onset date was far in the past"); Grebenick, 121 F.3d at 1201 (whether a medical advisor is required turns on "whether the evidence is ambiguous regarding the possibility that the onset of [the claimant's] disability occurred before the expiration of her insured status" and whether "a retroactive inference is necessary"). This view was also followed by Judge Hodges in Aurednick v. Sullivan, 733 F. Supp. 1460 (M.D. Fla. 1990) in which the Court adopted a report and recommendation from a magistrate judge in which the magistrate judge noted that SSR ruling 83-20 was applicable to the ALJ's determination of whether the claimant was disabled prior to the date last insured.

origin, the Court concludes that the most logical interpretation of SSR 83-20 is to apply

it to situations where the ALJ is called upon to make a retroactive inference regarding

disability involving a slowly progressive impairment, and the medical evidence during

the insured period is inadequate or ambiguous. Accordingly, in those situations the ALJ

should be required to obtain the advice of a medical advisor to assist the ALJ in making

the determination from the available medical evidence of whether the slowly progressive

impairment constituted a disability prior to the date last insured.

In the instant case, the Court concludes that Plaintiff's mental impairment was a

slowly progressive one and that the ALJ must make an inference regarding the

existence of the disability and, thus, SSR 83-20 is implicated. However, the evidence of

Plaintiff's mental impairment in the record is neither inadequate nor ambiguous but

rather is sufficient around the general time frame determined by the ALJ as the onset

date. As such, the ALJ was not required obtain a medical advisor to assist in the

determination of the onset date.

While Plaintiff's mental impairments had existed from December 31, 1997, the

date Plaintiff alleged was the onset, the substantial medical evidence of record support

the ALJ's conclusion that such impairments did not render Plaintiff disabled because

Plaintiff had the capacity to perform unskilled, sedentary work until at least May of 1999.

Plaintiff does not argue that the ALJ should have found a specific onset date, but only

that the ALJ erred by concluding that Plaintiff's disability began on May 1, 1999. The

ALJ and the agency psychologist who found Plaintiff met Listing 12.04A and B in

December of 1999 considered Plaintiff's mental health during the months of April and

May of 1999. The medical evidence from May consists of an evaluation by ARNP Nancy

Newbury on May 18, 1999 in which she noted that Plaintiff was sleeping better, but still
exhibited some signs of depression, paranoia, and histrionic personality disorder.
Newbury discussed treatment in individual and group therapy with Plaintiff and noted
that his GAF was 60. Immediately, prior to this visit, on April 14, 1999, ARNP Steele
noted that Plaintiff denied suicidal thoughts, Plaintiff's depression had improved, and
that he did not exhibit any signs of psychosis. Although Steele noted that Plaintiff's
depression and histrionic personality disorder continued she gave Plaintiff a GAF of 65
and referred him to therapy to work on anger and trust issues.

Finally, on April 28, 1999,  ARNP Steele completed the Medical Assessment of
Ability to Do Work-Related Activities. She noted at this time that Plaintiff had a good
ability to follow work rules, fair ability to interact with a supervisor, work independently
and use of judgment, but poor or no ability to relate to co-workers, deal with the public,
or handle stress at work. He was found to have a fair ability to maintain attention and
concentration, though he was easily frustrated due to anxiety. He had a good ability to
remember and carry out simple and complex instructions and maintain his personal
appearance. He had a fair ability to behave in an emotionally stable manner, relate
predictably in social situations, and demonstrate reliability.

While evidence from an ARNP is not weighed as heavily as that of a treating
physician,[44] the ALJ considered the evidence from ARNP Steele in March where she
noted that Plaintiff reported feeling calmer and sleeping better after taking prescribed

---

[44] Pursuant to 20 C.F.R. § 404.1513 (a) , (d), nurse practitioners are not considered an
"acceptable medical source," but the ALJ may evaluate evidence from nurse practitioners who are
considered, instead, "other sources."

medications and that he had a GAF of 60 which only demonstrated moderate limitations on his ability to function. The ALJ then contrasted this with the evidence from ARNP Steele and Newbury in late April and May where, despite maintaining a GAF of 60, Plaintiff was having paranoid thoughts and had a poor ability to deal with work stress and relate to coworkers. Even under the ALJ's assessment of unskilled, sedentary work, the Plaintiff needed to be able to relate to others and handle work stress as described in SSR 85-15. By late April-May, the ALJ determined that based on the medical evidence in the record, the Plaintiff no longer had these abilities and, therefore, could not perform even unskilled, sedentary work.

The agency psychologist specifically noted that Plaintiff's condition appeared to deteriorate after May of 1999. (R. 347, 355.) In making this determination, the psychologist relied on the psychiatric evaluation performed in October of 1999 that found Plaintiff to be very depressed, possessing poor cognition, and exhibiting signs of confusion and disorganization. The mental health personnel who evaluated Plaintiff at that time determined Plaintiff could not work. This was the first mental status evaluation in the record which concluded that Plaintiff's mental impairments precluded him from working and thereby rendered him disabled. The agency physician noted that the evidence of Plaintiff's mental impairments from September of 1998 until May of 1999 presented Plaintiff with only mild problems, some depression, fair memory, but poor concentration.

In addition, there is considerable evidence in the record documenting Plaintiff's deteriorated mental condition after October 1999 and through 2002, including

documentation of two suicide attempts and a GAF that dramatically decreased to 30 to 35.

Accordingly, the evidence in the record shows that Plaintiff still had the ability to perform unskilled, sedentary work during the period of time prior to May 1999 and thus the ALJ did not err in concluding that Plaintiff's mental impairment did not render him disabled prior to May 1999. To the contrary the substantial evidence relied upon by the ALJ established that  Plaintiff's mental impairments and his ability to perform the basic work skills of sedentary work severely declined after May of 1999. Because there was sufficient medical evidence in the record, both before and after May 1999 with regard to Plaintiff's mental impairments, the ALJ was not required to obtain the assistance of a medical advisor to determine the onset date of Plaintiff's mental impairment

## V.  CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 27, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel